## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Bankruptcy No.  13-82498 |
| | ) | |
| Waterworks, Inc., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge Lynch |

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Illinois State Bank's motion under 11 U.S.C. § 1122(b) to convert this case to Chapter 7 or in the alternative to appoint a Chapter 11 trustee.  For the reasons set forth below, the motion will be DENIED.

### Jurisdiction and Procedure

The Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (O) for which a bankruptcy judge to whom the case has been referred may enter final judgment. *See In re LG Motors, Inc.,* 422 B.R. 110 (Bankr. N.D. Ill. 2009).

### Procedural Background

The Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 16, 2013 and has been operating as a debtor in possession.

Illinois State Bank, Waterworks' primary secured creditor, asks the Court to convert the case to a Chapter 7 liquidation or to appoint a Chapter 11 trustee. (ECF No. 115.) The Court held two evidentiary hearings on the motion, each lasting several days, and has allowed the parties to supplement their briefs and the record.[1]

In considering the motion, the Court has examined the evidence presented, the stipulations of the parties and written and oral argument of counsel, as well as taken judicial notice of the contents of the docket in this case. *See CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.)*, 396 B.R. 730, 738 n.5 (Bankr. N.D. Ill. 2008) ("The court can take judicial notice of its own docket entries.").

## Factual Background

For the purpose of deciding this motion the Court finds as follows.

Waterworks, Inc. is a two-season business. During the warmer months the company installs and maintains landscaping sprinkler systems. In the winter it plows and removes snow and ice from parking lots. Its president, Karen Garbacz, is the sole shareholder of this Illinois corporation. Her spouse, Roger, is the company's operations manager. Previously, Mr. Garbacz served as its president. Together the Garbaczes have managed Waterworks since its inception more than twenty-five years ago.

---

[1] See ECF Nos. 205, 209, 211, 215, 217, 225, 346, 349, 351, 355, 383 and 386.

Besides the Garbaczes, Waterworks employs three full-time employees. In addition, the company hires temporary hourly workers depending on the workload. During the peak summer installation system it may employ as many as twenty to thirty hourly workers. In contrast, during the winter, the company may hire as many as six independent contractors to help with salting and snow removal. There is no dispute that the Garbaczes devote long hours to the business. Ms. Garbacz's routine responsibilities include bookkeeping, writing checks, and tallying the payroll. In addition, she handles snow and ice removal jobs as needed. His day-to-day responsibilities include supervising sprinkler installations and maintenance, snow plowing and salting (as well as supervising the contractors' removal work), meeting with customers and procuring job contracts.

Approximately one week before the Debtor filed for bankruptcy, Illinois State Bank obtained a judgment against the Debtor, the Garbaczes and an affiliated entity named Waterworks Underground Sprinkler Systems, LLC for several loans on which they had defaulted. The state court had entered judgment in favor of the bank jointly and severally against Waterworks and Karen Garbacz in the amount of $481,726.60 on a June 2010 note and loan agreement with Waterworks, and against the Debtor, its affiliate Waterworks Underground Sprinkler Systems, LLC and Roger Garbacz in the amount of $115,625 on an affiliate's June 2009 promissory note which Waterworks and Mr. Garbacz had guaranteed. The court also entered judgment solely against Roger and Karen Garbacz in the amount of $510,777.93 on a June 2010 note given by the

Garbaczes.  Additionally, judgment was entered jointly and severally against
Waterworks, Sprinkler Systems and the Garbaczes in the amount of
$51,911.95 for legal fees and costs.  The judgment provides for 9% statutory
interest on the principal amount awarded.  Thus, as the week before the
petition date the Debtor's indebtedness to Illinois State Bank under the
judgment debt amounted to $649,263.60.

It is undisputed that all or a portion of the Debtor's personal property,
including a number of vehicles, secured the judgment granted the bank.  The
Debtor scheduled $649,264.26 for the Illinois State Bank claim.  The schedules
indicating that this debt is secured by "Business assets" with an estimated
value of $483,319.41.  However, the debts that the Debtor jointly owed together
with the Garbaczes were also secured by certain of her or his property.  This
collateral included real estate located at 5200 McCullom Lake Road owned by
Ms. Garbacz in McHenry County.  Pre-petition, Waterworks operated from the
building located on that property.  The Garbaczes also granted the bank a
junior mortgage in their residence in McHenry County and a junior mortgage in
a second home in Wisconsin.

A. Post-Petition Use of Cash Collateral

Schedule B filed with the Debtor's petition disclosed that Waterworks had
$62,828.44 held in two operating accounts it maintained.  The schedule
further disclosed accounts receivable in the amount of $85,852.60 were owed

to the Debtor as of the petition date. (ISB Ex. 3.)[2] The Debtor's Statement of Financial Affairs claimed that $58,953.00 of the funds in its accounts as of the petition date were unearned deposits for sprinkler maintenance contracts. (Deb. Ex. B, Question 14.) Illinois State Bank did not present evidence to controvert these statements found in the Debtor's sworn to bankruptcy schedules.[3]

*The Interim Cash Collateral Orders.* A little over one week after filing its petition, the Debtor moved for authorization to use the Illinois State Bank cash collateral *nunc pro tunc* to the petition date. The June 13, 2013 motion identified the following uses for the cash collateral: "usual and ordinary property expenses; utility expenses, insurance premiums, repairs and maintenance of Waterworks' property, real estate and vehicle lease payments, usual and customary wages and salaries, fuel, equipment maintenance, and maintenance of reserves for unanticipated property expenses." (ECF No. 27.) The Debtor's initial proposed budget went through October 2013, projecting total expenses, including labor and cost of goods sold, of $102,466 for the last two weeks of July, $244,162 for August, $238,287 for September and $197,134 for October. The Debtor proposed for its "adequate protection" to the bank interest-only payments at the non-default rate for all indebtedness owed by the Debtor and its principals and affiliate. In addition, the Debtor proposed

---

[2] This figure excludes $425,269.11 in "Loan to shareholders" and $13,000 in "Employee advances" that the Debtor scheduled as "Accounts receivable." (ISB Ex. 3.)
[3] Declaring under penalty of perjury that the statements are true and correct to the best of his knowledge, information and belief.

to give the bank "a replacement lien against the Debtor's business assets including post-petition accounts receivable and after [acquired] collateral." (Id.)

After the hearing on the motion held on July 31, the parties submitted a proposed agreed interim order to authorize the use of "the Cash Collateral of Illinois State Bank for only those categories of expenses listed in the Budget attached to the Motion" through September 15, 2013. At the parties' request, the Court entered the proposed order. (Order, ECF No. 47.) The agreed order stated that the use of cash collateral was "authorized through September 15, 2013," but did not expressly state a beginning date for authorization. Although the budget submitted by the parties with the order included a column for the last two weeks of July, and despite the fact that the cash collateral motion sought the order to be entered *nunc pro tunc* as of the petition date, the order as submitted stated only that it "is effective immediately." (Id.) Neither party raised the issue of retroactive relief at the July 31, 2013 hearing, nor did the Court make a specific ruling on the issue.

Under the terms of the agreed order, the Debtor granted "to Illinois State Bank replacement liens with the same validity and priority on all accounts receivables and contracts of the same kind and nature on which Illinois State Bank had a duly perfected and valid lien and security interest on a prepetition basis, with any such liens and security interests to be automatically perfected without further action by the Debtor or Illinois State Bank." The Debtor also agreed to pay Illinois State Bank $15,000 within 3 days after entry of the order,

the amount "to be applied to principal reduction of Debtor's indebtedness to Illinois State Bank", and pay an additional $7,500 to the bank by September 3, 2013. That amount was to be "similarly applied to principal reduction of Debtor's indebtedness." (Id.) Similar interim cash collateral orders for use of cash collateral were subsequently agreed to by the parties and entered by the Court in 2013.[4]

The hearings during this time went relatively smoothly. For example, during a status hearing on October 28, 2013, Illinois State Bank's counsel agreed with the Debtor's counsel's comment that the bank had agreed to a 60-day interim extension of cash collateral "on the same terms" as prior orders despite the lack of that express provision its motion or the order in question. The December 2013 hearings however, proved to be significantly more difficult. Illinois State Bank raised concerns that although the Debtor was now engaged in its winter business it had not provided the bank with a budget or furnished requested information regarding its snow-plowing operations. The parties were unable to resolve cash collateral issues until the eve of the deadline and the resultant Fifth Interim Order, entered on January 10, 2014, was by their

---

[4] The Second Interim Order, entered on September 20, 2013, authorized use of cash collateral "from September 16, 2013 through October 2, 2013." (ECF No. 67.) This second order was later amended on October 24, 2013, effective nunc pro tunc to September 20, 2013, to add an inadvertently omitted requirement that the Debtor pay Illinois State Bank $5,000 to be applied to principal reduction of indebtedness as adequate protection. (ECF No. 82.) The Third Interim Order, entered on October 24, 2013 to authorize use of cash collateral "from October 2, 2013 through October 31, 2013", required an adequate protection payment of $5,000 for October which would be applied to principal reduction. (ECF No. 83.) The fourth such order, entered on November 26, 2013, authorized the use of cash collateral from November 1, 2013 through December 30, 2013, with the Debtor to make $6,000 adequate protection payments in November and December, each to be applied to principal reduction. (ECF No. 90.) The Fourth Interim Order continued to refer to the budget attached to the original motion, even though that budget only ran through October 2013.

request granted *nunc pro tunc* to January 1, 2014. That order, authorizing the use of cash collateral in January 2014 referenced an "attached" weekly budget, which was filed on January 9, 2014, and which provided for a weekly budget of expenses totaling $12,050.00 per week. (ECF No. 132.) This budget was in a different format and far simpler than earlier or later budgets, including as expenses only seven categories: "Salt, Payroll, Auto/fuel, Shop Suppl, Insurance, Loans-vehicles [and] Utilities." (Id.) Unlike the earlier interim orders, the Fifth Interim Order limited use of cash collateral not only by type but by amount, stating that the Debtor was "authorized to use the Cash Collateral of Illinois State Bank for only those categories of expenses in the amounts listed in the weekly Budget." (ECF No. 133, emphasis added.) The agreed order provided for the Debtor to pay an adequate protection payment of $20,000 to be applied to the reduction of the Debtor's indebtedness for January 2014. (Id.) This payment was not included in the January budget, nor was other categories of expenses that would be expected, such as payroll taxes or the U.S. Trustee's fee. (ECF No. 132.)

On January 22, 2014, the Debtor's counsel promised that the Debtor would be able to provide a full 13-week budget by January 24. It did not do so, however, and at the January 29, 2014 hearing, when a budget was still not available, the Court reminded the Debtor that no use of cash collateral was permitted until a budget was submitted and an order authorizing such use was entered. An agreed Sixth Interim Cash Collateral Order finally was entered on February 5, 2014 which authorized the use of cash collateral "from February 5,

2014 through February 28, 2014." (ECF No. 153.) The order attached a weekly budget from February 2, 2014 through May 3, 2014, and authorized the Debtor to "use the Cash Collateral of Illinois State Bank for only those categories of expenses in the amounts listed in the Budget." (Id.) It also provided for the Debtor to pay Illinois State Bank $20,000 in adequate protection payments for the month of February, to be applied to the reduction of the Debtor's indebtedness, and an additional $2,000 for placement in a real estate tax escrow account for payment of post-petition real estate taxes for the McCullom Lake Road property. (Id.)

In its reply brief filed in support of its motion to convert the case or appoint a trustee, Illinois State Bank alleged for the first time that the Debtor had used its cash collateral without court approval. It asserted that the Debtor wrote over fifty checks totaling over $40,000 between the petition date and July 25, 2013, when the initial motion for use of cash collateral was filed. (ECF No. 164.) The bank also alleged that subsequent to the petition date, Ms. and Mr. Garbacz violated Section 364 of the Bankruptcy Code by making a number of post-petition loans to the Debtor without court approval.

Between February 2014 and the date of this decision fifteen additional agreed interim cash collateral orders have been entered on terms similar to the Sixth Interim Order.

*Actual Use of Cash Collateral.* The Debtor's initial monthly operating report, filed August 23, 2013, states that between the July 16, 2013 petition date and

July 31, 2013, the date the motion to use cash collateral was presented, the

Debtor expended $141,239. (Rep., Ex. 8, ECF No. 49.) This amount consisted

of $3,153 for officers' payroll, $19,361 for "other" payroll, $8,592 for payroll

taxes, $24,619 for merchandise bought and a $85,514 category titled "other

necessary expenses." The last category, according to the report, included a

$7,500 rent payment to Karen Garbacz for the McCullom Lake Drive premises.

The budget attached to the initial cash collateral motion, however, anticipated

expenses for the last two weeks of July 2013 of only $102,466, which figure

included expense categories for payroll, officer's payroll, rent-building, and

materials & supplies. At trial, Ms. Garbacz admitted that the Debtor exceeded

the budget, testifying that she did not know that the additional payments were

not authorized because they were "business as usual." The initial report

indicated that the cash account balance had decreased by $32,123 from July

16 to July 31, 2013, as well as a decrease in accounts receivable of $3,005.

Expenditures from August through October 2013 remained well within

budget. In August, the Debtor reported spending $175,967. During this period

it reported reductions in its accounts receivable in the amount of $377 and

cash account balance in the amount of $23,234. (ECF No. 68.) For September,

Debtor's respective reported figures were $150,892 in spending, with a $14,338

increase in accounts receivable and a $6,030 decrease in cash account. (ECF

No. 78.) Although, as mentioned above, the Debtor exceeded the total expenses

predicted by $38,773 for the first two week post-petition in July 2013, the

Debtor's total expenditures during that 3.5 month period covered by the budget

were $173,929 under budget. The Debtor's monthly operating report filed November 19, 2013 showed that the Debtor spent $140,022 during the month of October 2013 and that the Debtor's cash account balances decreased by $18,759 and its outstanding account receivables decreased by $7,919. (Ex. 16, ECF No. 88.)

According to the Debtor's monthly operating reports, the Debtor spent $45,808 during the month of November 2013 and $59,448 during December 2013. (ECF Nos. 106, 138.) The Debtor's cash accounts increased by $20,832 and outstanding accounts receivable increased by $70,771 during that period. However, part of the reason that the Debtor's cash balances increased during November and December 2013 was because Roger and Karen Garbacz deposited $2,100 on November 22, 2013, $10,000 on December 3, 2013, and $6,000 on December 23, 2013 into the Debtor's accounts out of their own funds.

As mentioned above, the interim cash collateral orders for November and December 2013 referenced the budget attached to the original motion even though the budget did not include estimates for those two months. However, it is not reasonable under the circumstances to believe that either party intended the orders to permit no expenditures. Nor is it particularly relevant that the budget did not set forth amounts for November or December, since the interim cash collateral orders for August through December 2013 limited use of cash collateral only by category and not by amount. Illinois State Bank has not

identified any particular expenditure by the Debtor between July and December 2013 that was not within a category of expenses listed in the budget. Additionally, the Debtor only expended $45,808 in November and $59,448, less than a third of the average monthly expenditure for the prior three months.

As described above, beginning with the January 2014 order, the interim cash collateral orders included language limiting use of cash collateral not only by category but by amount. The Fifth Interim Cash Collateral Order permitted the Debtor to spend $12,050.00 per week during the month of January 2014. (ECF No. 133.) Adjusting this weekly budget pro-rata to a 31-day month results in a monthly budget of $53,364.29 for the month of January. However, the Debtor exceeded this budget by over $50,000, spending $113,048 during January 2014. Ms. Garbacz testified in May 2014 that they tried to stay within budget, but that if necessary actual expenses exceeded the budget they would still pay the expenses. She noted that the weekly budgets did not match up with calendar months and that she never analyzed the budget to see what they could use in a calendar month. She further testified that she did not realize that they needed court approval to exceed budgets. From the disbursements listed in the January monthly operating reports, it appears that the Debtor exceeded its budget in January not because of spending on illegitimate expenses but rather because the budget – which was far less detailed and far smaller than any other month's budget – was hastily and improvidently proposed. Indeed, the budget did not even include the $20,000 adequate protection payment that the Debtor made to Illinois State Bank. But the bank

can hardly protest this payment as an unnecessary expenditure. Other large disbursements that were not included in the budget were the $1,950 U.S. Trustee's fee for this bankruptcy case and a payment of a $3,591.91 unemployment tax. Roger and Karen Garbacz also testified that January 2014 was the third snowiest January in the area on record, causing certain expenses such as salt and hourly payroll to be higher than expected.

In February 2014, the Debtor spent $102,276, slightly less than the $106,946 in total expenses budgeted in the Sixth Interim Order.[5] However, Ms. Garbacz testified that she withdrew $13,000 from the Debtor's account on or about February 10, 2014 to purchase a replacement Bobcat after another one broke down. There was no category in the budget that would authorize a payment so large in a single week. The budget included categories for "Auto & Truck Expense" of $1,200 per week, "Repairs & Maintenance & Cleaning" of $550 per week and "Miscellaneous" of $250 per week. Ms. Garbacz testified that she believed that under the Debtor's snow removal contracts the Debtor had to have a functional Bobcat on its customer's site "24/7" and that she believed repairing or replacing it was an emergency. However, it is undisputed that the Debtor took no step to seek either Illinois State Bank's or the Court's approval in advance before purchasing the replacement.

In each of March, April, May and June 2014, the Debtor may have exceeded the total monthly expenses permitted under the cash collateral orders for those

---

[5] This figure includes March 1, 2014. If the final week in the budget is decreased *pro rata* to six instead of seven days, the total budget for February becomes $102,367.40, still slightly more than the actual expenditures.

periods, depending on the calculations. Because the cash collateral order budgets for those months were weekly budgets, while the evidence of actual expenditures in the Debtor's monthly operating reports are monthly, it is sometimes difficult to compare. If the budgets are adjusted *pro rata* by days for weeks in the budget that span multiple months, the Debtor exceeded its maximum budgeted expenditures by an average of nearly $15,000 per month during those four months. However, if the monthly budget is calculated by attributing the full week's budget to that month even if only a portion of the week is in that month – a method that would result in double-counting – then each of those four months would be within budget.

Ms. Garbacz also testified that the Debtor paid her $2,308.75 in weekly payroll for four weeks in March 2014, even though the cash collateral order only permitted officer salaries of $2,000 per week. (ECF No. 169.)[6] She testified that she believed the $2,000 limit was for "net pay" not "gross pay." The same practice continued in April 2014, but was corrected beginning with the first paycheck in May 2014. From that month on she received only $1,847 in payroll per week. Ms. Garbacz testified that on July 21, 2014 she deposited $2,000 into Waterworks as payback for any "boo-boos" she might have made.

---

[6] The simple weekly budget attached to the January cash collateral order did not distinguish between officer and other payroll, instead allowing for total weekly payroll of $4,600. (ECF No. 132.) The monthly operating report for January 2014 shows that the Debtor stayed within this limit even while paying Karen Garbacz $2,308.75 per week for the first four paydays in January, but paid a total of $7,195.99 on January 31, 2014. (Ex. 56, pp. 12-16, ECF No. 157). Because earlier weeks were less than the limit, the Debtor spent a total of $18,233 on payroll in January 2014, which was less than the $20,371.43 *pro rata* by days limit set under the weekly budget. Additionally, the January 31, 2014 payroll appears to include double payments, while the next month's operating report shows that there was no payroll made on February 7, 2014. (ECF No. 181.) For February, the Debtor paid Karen $2,308.75 per week for the final three weeks of February, despite the cash collateral budget's limit to $2,000 per week for officer's salary. (Id.)

The Debtor's more recent history of compliance with cash collateral budgets has been much improved.  From July 2014 through April 2015, the Debtor's total monthly expenditures were consistently well below the budgeted total monthly expenses.  Even using the *pro rata* approach, the Debtor was at least $14,000 under budget in every one of those months.  The Debtor may have slightly exceeded its budget in May 2015 depending on interpretation of the budget and cash collateral order.  The May 2015 budget attached to the Nineteenth Interim Cash Collateral Order for some reason included a budget only through May 27, 2015, even though the order permitted use of cash collateral through May 31, 2015. (ECF No. 399.)  The Debtor spent $183,164.00 in May 2015, while the 27-day budget was only $179,447.61.  However, if the last four days of May are taken *pro rata* from the week ending in June 3, 2015 from the Twentieth Interim Cash Collateral Order – even after deducting one day of April *pro rata* from the first week of the May weekly budget – the total budget for May would be $185,342.14, slightly higher than the actual expenditures in May 2015. (ECF No. 413.)  The Debtor more clearly stayed within budget in June 2015, spending only $166,100 in comparison to the $189,112.86 budget (*pro rata* by days for stub weeks, or $222,605 for the full 5 weeks of the budget).

Despite the Debtor's inability to stay within budget in certain early months during the pendency of this case, the Debtor was able to generate significant net profits over this period.  The June 2014 monthly operating report indicated that the Debtor's cash account balance had increased to $160,553 as of the

end of June 30, 2014, though it is unclear what portion of this may have constituted unearned customer deposits for future sprinkler service work. (ECF No. 231.) The same operating report indicated that the Debtor's total outstanding accounts receivable had increased to $107,991 as of the end of June 2014. Therefore, the Debtor's cash position appears to have significantly increased from the July 16, 2013 petition date, when the Debtor's schedules indicated it had $62,828.44 in cash accounts and was owed $85,852.60 in accounts receivable.[7] During that same period through June 2014, it is undisputed that Illinois State Bank received $145,500 in adequate protection payments under the First through Eighth Interim Cash Collateral Orders between the petition date and the end of June 2014.

### B. Pre-Petition Loans, Payments and Disposition of Collateral and Post-Petition Contributions or Loans

Among the assets identified by Waterworks in its initial Schedule B is a $425,269.11 "Loan to shareholders." (ISB Ex. 3, ECF No. 21.) The Debtor's balance sheet and account ledger, however, reflect a shareholder loan with a balance of $357,672 as of the petition date. The amended Schedule B later lists the loan amount to be $357,672.07. (ECF No. 195.)

The Debtor's accountant, Kevin Miller, credibly testified that these book entries refers not to a traditional direct cash loan from the Debtor to the Garbarczes, but rather to one or more transactions that he characterized as

---

[7] The Debtor's reports that as of June 30, 2015, its total accounts show a balance of $115,421 and total outstanding accounts receivable of $216,674. (ECF No. 423.)

shareholder loans for accounting purposes. The bulk of the entries relate to a refinancing in June 2010 whereby several loans from Home State Bank to the Debtor and to the Garbaczes were paid off with the proceeds of a new loan from Illinois State Bank to the Debtor. Because one of the loans paid off with the new loan to the Debtor was a $206,413.89 loan from Home State to the Garbaczes, the accountant treated the benefit the Garbaczes received by no longer being liable on the loan as a loan from the Debtor to the Garbaczes. (See Debtor's Ex. L.)

Similarly, later entries in the Debtor's books designated as shareholder loan repayments were not always direct cash payments. For example, the Garbaczes traded two Priuses that they owned individually as part of the purchase price for a vehicle that the Debtor purchased in February 2012. Mr. Miller treated the trade-in value effectively received by the Debtor for the two Priuses as a loan repayment of $18,500. Other portions of the shareholder loan were payments that the Garbaczes thought of as salary or corporate distributions, but which Mr. Miller treated as loans to shareholders for accounting purposes. Mr. Miller also characterized certain deposits of funds by the Garbaczes into the Debtor's accounts as loan repayments for accounting purposes, while the Garbaczes thought of the deposits as capital contributions.

Waterworks' records show that Karen and Roger Garbacz made post-petition transfers or deposits into the Debtor's accounts: $10,000 on October 25, 2013, $4,600 on November 15, 2013, $2,100 on November 22, 2013, $1,100 on

November 26, 2013, $10,000 on November 30, 2013, and $6,000 on December 6, 2013. Ms. Garbacz testified that they deposited those funds at those times to enable to the Debtor to pay its necessary business expenses. In each case, the Debtor's books treat the deposit as a repayment of the shareholder loan.

According to the Debtor's Statement of Financial Affairs, the Debtor paid Roger Garbacz a total of $4,175 as "S corp distributions" during the year preceding its petition. Waterworks' statement also discloses that the Debtor paid Karen Garbacz a total of $135,446.00 as "Rent and S Corp. distributions" during this time. There is no dispute that Ms. Garbacz owned the McCullom Lake Road property then used by the Debtor and that she and Waterworks never had a written lease agreement. She testified that pre-petition, the Debtor generally made distributions when the business was profitable – especially during the summer. When business was slow, she testified, she and her spouse would put their own money into the company to keep it afloat.

As first presented, the motion to convert or appoint a Chapter 11 trustee heavily relied upon the allegation that the Debtor was unable to account for 16 of the 47 vehicles pledged as collateral. During the first evidentiary hearing on the motion, the bank spent much of its time questioning witnesses about these vehicles. The testimony revealed that most of them were in fact in the possession of the Debtor, but inoperable and stored on farmland leased by the Debtor leased and of little value except as scrap. The testimony further revealed that although some of the vehicles may have been sold or scrapped

without the bank's express prior consent, those events occurred pre-petition. Not surprisingly, after the initial trial the bank filed a stipulation to withdraw "any contention that the Debtor has failed to account for any of the bank's motor vehicle collateral." (ECF No. 205.)  Nevertheless, the bank continued to contend that the Debtor had improperly sold or transferred five vehicles listed as collateral:  a 2001 Ford F-450, a 2000 Ford E-150, a 1998 Land Rover, a 1989 Chevrolet K-1500 and a 1989 Ford F-350.

The evidence presented at trial shows that in June 2012 Waterworks sold the Ford F-450 to a company named Concept Engineering for $16,000, the amount payable in two installments.  The purchaser paid the first $8,000 installment on June 11, 2012.  The second $8,000 installment was paid post-petition upon notice and with leave of Court. (ECF No. 75.)  With the bank's consent and upon receiving authorization from the Court, the Debtor turned the second payment over to Illinois State Bank.

Roger Garbacz testified that the Debtor traded the 1998 Land Rover in December 2005 to purchase another vehicle.  Also uncontroverted is his testimony that the 2000 Ford E-150, lacking an engine, transmission or seats, was used as a sign for a pizza restaurant until it was towed away pre-petition. He valued that item to be worth $100 at most.  According to Mr. Garbacz, Waterworks also junked the 1989 Chevrolet and 1989 Ford.  He testified that he notified the bank before doing so, identifying on the witness stand a copy of

a letter he claimed to have sent to the bank in May 2012 to inform it of his intent to junk the pickup trucks. (ISB Ex. 48.)

## C. Status of the Bankruptcy Case and Creditor Claims

Waterworks admits that it is a small business debtor as defined by Section 101(51D) of the Bankruptcy Code. Accordingly, the Debtor had the exclusive right to file a plan within 180 days of commencing its case. 11 U.S.C. §§ 1121(b). Waterworks sought to extend the exclusivity period, but its request was denied. (ECF No. 134.) The Debtor filed a disclosure statement and proposed plan of reorganization on May 12, 2014, after the expiration of the exclusivity period. (ECF Nos. 199, 200.) However, no creditor has filed a competing plan. The Court continued the hearing on approval of the disclosure statement until this motion could be resolved.

Waterworks proposed plan of reorganization provides for the repayment of Illinois State Bank in full with interest at 5.5% *per annum*, with a 10 year amortization schedule and full balloon payment after five years. (ECF No. 200.) As proposed, a portion of the bank's claim will be paid by the surrender or from the proceeds of sale of certain collateral, including the Garbaczes' second home in Wisconsin. The plan also provides for payment of tax claims in full with statutory interest over five years, payment in full of several outstanding vehicle loans, and the payment of 50% of the allowed general unsecured claims without interest in four semi-annual installments.

The bar date for the submission of all claims has long passed. (ECF No. 175.) Based on the timely filed proofs of claim, Waterworks' Disclosure Statement states that the Debtor intends to pay to Illinois State Bank $694,264.26. It further discloses the Debtor's intent to pay pre-petition tax creditor claims of $77,651.25 and 50% of the general unsecured claims ($25,701.60). The Debtor estimates this will require monthly payments of $7,054.21 to Illinois State Bank, monthly payments of $1,971.83 to tax creditors, and semi-annual payments to general unsecured creditors for two years, averaging $1,070.90 per month. The estimates contained in the Disclosure Statement indicate that in order to make the proposed plan payments the Debtor will need to realize average monthly net income of approximately $10,097. The Debtor's monthly operating reports show that from the commencement of this case through June 2004, the Debtor's average net profits together with its adequate protection payments to Illinois State Bank average approximately $10,921 per month.

At this time it appears that Illinois State Bank's claim may be less than $649,264.26, the amount the Debtor proposes to pay it in its plan. The Debtor's monthly operating reports disclose that through June 2015 Waterworks has paid a total of $238,917 in adequate protection payments to the bank. There appears to be no dispute about this amount.

In addition, the Court has authorized the Debtor to surrender certain vehicles, equipment and building contents, estimated to have an aggregate

value of $90,800, to Illinois State Bank to sell in a commercially reasonable manner. The proceeds are to be applied to the bank's claim against the Debtor. (ECF No. 322.) The bank recently reported receiving $8,755 from the net proceeds from the sale of equipment, $156.56 from the sale of furniture, and $2,585.44 for equipment sold at auction. All of these items were collateral pledged to the bank.

In addition, the Garbaczes sold their Wisconsin summer home on or about October 27, 2014 (ECF No. 308), from which proceeds they paid the bank $114,950.87. (ECF No. 438.) The settlement statement and affidavit show that this payment was made in satisfaction of the second mortgage granted by the Garbaczes to secure the debt of the Sprinkler Systems company. The Debtor had guaranteed Sprinkler Systems' debt. According to the judgment order that the bank attached to its proof of claim filed in this case, at least $115,625.71 of the bank's asserted claim of $649,264.26 is attributed to that debt guaranteed by the Debtor.

In October 2014, the Debtor moved with the Court's approval from the McCullom Lake Road property to a new location in Richmond, Illinois. (ECF No. 284.) Karen Garbacz subsequently surrendered her interest in the McCullom Lake Road property to the Illinois State Bank. The bank recently reported that the surrendered property was sold at foreclosure for $482,000. The bank represents that the foreclosure sale price is not sufficient to satisfy its first position lien for the money judgment against Mr. and Ms. Garbacz,

individually, leaving a deficiency of $92,383.31 against the individuals. Accordingly, this sale did not affect the bank's second-position lien that constitutes a portion of the Bank's claim against the Debtor.  (ECF No. 438.)

On July 27, 2015, the Debtor's counsel represented to the Court that he believes that based on recent appraisals the remaining surrendered collateral is worth "$70,000 or less."

### Discussion

A.  <u>Conversion to Chapter 7</u>

Section 1112(b) of the Bankruptcy Code provides that upon the request of a party in interest the court shall dismiss or convert a case to Chapter 7 "for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate." 11 U.S.C. § 1112(b)(1).  The Seventh Circuit has held that the party seeking conversion bears the initial burden of proving by a preponderance of the evidence that cause exists for dismissal. *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994). Once the movant shows "cause" the burden "then shifts to the debtor to establish one of the exceptions enumerated in section 1112(b)(2)." *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) (citing *In re Draiman*, 450 B.R. 777, 826 (Bankr. N.D. Ill. 2011)).  However, the court "may not convert ... or dismiss" the case if (i) it "finds and specifically identifies unusual circumstances establishing that converting or dismissing the

case is not in the best interests of creditors and the estate" and (ii) "the

debtor or any other party in interest establishes

> (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
> (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)--
>
>> (i) for which there exists a reasonable justification for the act or omission; and
>>
>> (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b).  Subpart (b)(4) lists circumstances constituting "cause" for

dismissal or conversion:

> (A)   substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;
> (B)   gross mismanagement of the estate;
> (C)   failure to maintain appropriate insurance that poses a risk to the estate or to the public;
> (D)   unauthorized use of cash collateral substantially harmful to 1 or more creditors;
> (E)   failure to comply with an order of the court;
> (F)   unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter;
> (G)   failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor;
> (H)   failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any);
> (I)   failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief;

(J)   failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court;

(K)   failure to pay any fees or charges required under chapter 123 of title 28;

(L)   revocation of an order of confirmation under section 1144;

(M)   inability to effectuate substantial consummation of a confirmed plan;

(N)   material default by the debtor with respect to a confirmed plan;

(O)   termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and

(P)   failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

11 U.S.C. § 1112(b)(4).  "This list is not exclusive."  *In re Takena USA, LLC*, 419 B.R. 341, 356 (Bankr. N.D. Ill. 2009).

Nothing in Section 1112(b) requires dismissal or conversion. *In re Jartran, Inc.*, 886 F.2d 859, 868 (1989).  This court is mindful of the principles of open access that guide the bankruptcy process and the need "to allow debtors a fair opportunity to reorganize their assets." *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013) (citing *In re Strug-Div., LLC*, 375 B.R. 445, 449 (Bankr. N.D. Ill. 2009)).  Indeed, as Judge Schmetterer cautioned in *Strug-Div.*, "the court must be careful not to deny the protection of the Bankruptcy Code to a debtor whose legitimate efforts at financial rehabilitation may be hidden among derivative benefits" that might suggest grounds for dismissal or conversion if viewed alone. *Id.*

The bank's conversion argument has undergone a number of revisions since it first presented its motion. It initially argued for conversion under subparts 1112(b)(4)(A) and (B), alleging that (1) the Debtor has "failed to pursue any avoidance actions against insiders and other preferred vendors for fraudulent transfers and preferential transfers," (2) was unable to account for sixteen vehicles pledged as collateral to the bank, and (3) had operated at a loss for the months of July, August, September and October 2013. (ECF No. 115.) Later, the bank added the claim that the Debtor used cash collateral without authorization during the first two weeks after the petition date. It argued that this violated Section 363(c)(3) and, therefore, prevents the Debtor from satisfying Section 1129(a)(2). (ECF No. 164.) The bank also alleged that the Garbaczes made unauthorized post-petition loans to the Debtor to argue gross mismanagement precluding confirmation. Finally, after the initial evidentiary hearing, the bank raised five additional allegations in support of its motion: (i) the Debtor may have used customer deposits before they were earned; (ii) its January 2014 profit and loss statement contains a $59,000 discrepancy; (iii) Ms. Garbacz's salary is unreasonable and indirectly compensates her husband; (iv) the Debtor paid rent paid to Karen Garbacz for its use of the McCullom Lake Drive property without a written lease; and (v) the monthly operating reports prepared by the Debtor's accountant are invalid.

*Failure to Commence Adversary Proceedings.* Illinois State Bank first contends that the case must be converted for gross mismanagement because the Debtor has not brought adversary proceedings against the Garbaczes or

creditors who received payments from Waterworks within the ninety day period
preceding the commencement of the case.  To support its argument the bank
cites two decisions in which the bankruptcy court ordered conversion where
the Chapter 11 debtors did not act to avoid prepetition transfers.  *In re SAL
Caruso Cheese, Inc.*, 107 B.R. 808 (Bankr. N.D.N.Y. 1989); *In re Hampton Hotel
Investors, L.P.*, 270 B.R. 346 (Bankr. S.D.N.Y. 2001).  In those cases, however,
the court found that conversion was justified by a pattern of egregious
misconduct that when taken as a whole was found to warrant conversion. As
the court emphasized in *SAL Caruso*, "each event described herein standing
alone would probably not establish an entitlement in this court of equity to the
relief requested by the UST."  Rather, it found that "the sum total of all these
events and transgressions creates a congery of cause within the meaning of
Code § 1112(b)." 107 B.R. at 821.

In *Hampton Hotel,* for example, the court found: repeated unauthorized
post-petition payments to professionals, including attorneys whose
employment had not been approved by the court, and unauthorized post-
petition transfers to the debtor's general partner;  erroneous monthly operating
reports;  $45,000 in missing funds; repeated post-petition, unauthorized
borrowing from and payments to affiliates; and the payment of pre-petition
debts without authorization. *Id.* at 352-54.  The debtor's general partner
"repeatedly resisted efforts by the UST to ascertain" certain financial
information. *Id.* at 354.  "Most egregious of all", the court found, was a secret
agreement to bid on assets of the estate for the general partner's own benefit

which he had entered into with a creditor. 270 B.R. at 354. Considering these circumstances in their entirety, the court concluded that the debtor "was managed, in numerous material respects, with a total disregard for the duties of a debtor in possession," finding that the "self-dealing actions by [the debtor's general partner] in this case cry out for investigation." *Id.* at 357.

Similarly, the bankruptcy court in *SAL Caruso* found that the debtor and its sole owner were engaged in an egregious pattern of purposeful misconduct both pre- and post-petition. The debtor, who had ceased operating pre-petition after its main premises were destroyed in a suspicious fire, adamantly unwilling to "capitaliz[e] on its assets [or] actively set[] up shop in another location," instead without court approval post-petition sold assets and entered into agreements outside the ordinary course regarding use its tradename without consideration. 107 B.R. at 820. Additionally, the debtor's petition and schedules "evidence[d] a host of inconsistencies," and failed to disclose that it had sold or transferred numerous pieces of equipment and supplies shortly before the fire. *Id.* at 810, 817. The debtor failed to timely file monthly operating reports and the one and only report that the debtor filed was "misleading and incomplete." *Id.* at 818. In addition, the court found SAL Caruso's entire proposed plan of reorganization to be "unrealistic in terms of implementation in setting a starting date geared to the receipt of ... fire insurance proceeds which [were] a nebulous exercise in speculation." *Id.* at 820. Based on a record that "evince[d] a parade of episodes ... that appear to

have been carried out in direct violation of Code §§ 363, 541, 547, 548, 549 and 1107(a)," the court ordered conversion. *Id.* at 817.

The pending case does not present such a pattern of wrongful conduct as was found to pervade the *SAL Caruso* and *Hampton Hotel* bankruptcies. While the bank suggests that certain payments made by the Debtor to Roger and Karen Garbacz pre-petition *may* be avoidable as either fraudulent transfers or preferences and despite the ample opportunity to present any proof, this case lacks evidence that payments were either made on account of an antecedent debt or were not in exchange for reasonable value. Nor has it been shown that any payments were made while the Debtor was insolvent, or that Debtor's inaction constitutes bias or incompetence. It is not alleged that recovering pre-petition transfers or the "shareholder loan" is even necessary to effectuate Waterworks proposed reorganization plan. The Debtor's plan instead proposes to pay most of its creditors – including Illinois State Bank – in full.

Nor is it accurate to say that the Debtor, unlike the debtors in the New York decisions cited by the bank, has failed to take steps to effectuate its plan and successfully emerge from bankruptcy. The bank admits that the Garbczes have paid the Debtor at least $30,000 post-petition as loan repayments reflected in the Debtor's financial records. It is not disputed that since this case began the Garbaczes have sold their second home and from that sale remitted to the bank $114,950.87 in payment of a portion of the bank's claim against the Debtor. Recently, the bank also reported receiving approximately

$11,496.00 representing the net proceeds from the court-approved sale of collateral.  Considering the actions of the debtor as a whole, the Court cannot conclude that the Debtor's failure to pursue adversary proceedings against individuals who have been foregoing salary (as is the undisputed case for Mr. Garbacz) and surrendering assets to the bank even remotely demonstrates gross incompetence.  Nor can it conclude that it is in the best interest of creditors and the estate to convert the pending Chapter 11 case pursuant to Section 1112(b).

*Pre-Petition Disposition of Vehicles*.  The bank also contends that the Debtor may have disposed of five vehicles pre-petition in which it held a security interest.  The weight of the evidence shows that three of the vehicles were inoperable or of little value as of the petition date.  As for the pre-petition sale and trade-in of the other two vehicles, there is no evidence that they were sold for less than their reasonable value.  The bank does not dispute that it received more than $8,000 from the sale of one of these vehicles.

The pre-petition sale or transfer of collateral without authorization from the creditor is one of a number of factor to consider in determining  whether the petition was filed in bad-faith. *See In re Tekena USA, LLC*, 419 B.R. 341 (Bankr. N.D. Ill. 2009).  However, such action by itself does not justify conversion of a case.  "Conversion or dismissal is a 'drastic measure' and the movant bears the burden of proving that the relief requested is 'warranted and not premature.'" *In re Bovino*, 496 B.R. 492, 499 (Bankr. N.D. Ill. 2013)

(quoting *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y.

1989)). Indeed, at least some degree of pre-petition mismanagement can be

found "in virtually every insolvency case." Such conduct then must be viewed

in light of the "philosophy of chapter 11 [which] is to give the debtor a 'second

chance' at business success." *In re Sletteland*, 260 B.R. 657, 672 (Bankr.

S.D.N.Y. 2001) (quoting 7 Collier Bankruptcy ¶ 1104.02[3][c][i] (15th L.King.

ed.)). *See also In re Daily*, 2009 WL 3415204 (Bankr. M.D. Tenn. Oct. 19,

2009). Here, there is no evidence that the complained-of disposition of virtually

junk vehicles was done to deprive the bank of the reasonable value of its

collateral or otherwise demonstrated bad faith.

   *Use of Cash Collateral*. Cause for conversion includes the "unauthorized

use of cash collateral substantially harmful to 1 or more creditors." 11 U.S.C.

§1112(b)(4)(D). As an initial matter, Illinois State Bank has not demonstrated

that it or any other creditor was substantially harmed by the Debtor's

unauthorized use of cash collateral. Other than a potential dispute over what

portion of deposit account funds constitutes unearned customer deposits, it is

undisputed that as of the petition date the Debtor had $62,828.44 in deposit

accounts and was owed $85,852.60 in accounts receivable. It is similarly

undisputed that as of June 2014 those amounts had increased to $160,553 in

deposit accounts and $107,991 in accounts receivable. As of the end of June

2015 those amounts had further increased to $115,421 in deposit accounts

and $216,674 in accounts receivable.

The total amount of the Debtor's deposit accounts and accounts receivable has increased by nearly $200,000 since the petition date. Testimony presented at the shows that Illinois State Bank would not have hold a security interest in the newly generated, post-petition accounts receivable or proceeds were it not for the replacement liens granted to the bank under the agreed interim cash collateral orders. *See* 11 U.S.C. § 552(a) (with certain exceptions, "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case"). In addition, since this case began Illinois State Bank has received $238,917 in periodic adequate protection payments pursuant to those cash collateral orders as "adequate protection" for the use of that cash collateral. These payments represent more than 34 per cent of the bank's claim as of the petition date.

It is therefore difficult for this creditor whose position has so improved in the course of the Chapter 11 case to demonstrate that it was harmed, let alone substantially harmed, by the Debtor's use cash collateral to continue the operation of its business during the initial two weeks before its unopposed motion for use of cash collateral was presented or in the isolated instances where Waterworks exceeded its approved budgets. Further, it is not alleged that another creditor has been harmed by these events.

In *In re Visicon Shareholders Trust*, the court found substantial harm where a debtor used cash collateral "to pay the numerous personal expenses of

the insiders, to pay prepetition claims, to make unauthorized payments to professionals, to make mortgage and condominium association payments on [the debtor trust beneficiary's mother-in-law's] Florida condominium, to make the lease payments on [the debtor trust beneficiary's and her mother-in-law's] automobiles, and the payment of expenses for which no explanation was given." 478 B.R. 292, 314 (Bankr. S.D. Ohio 2012). In contrast, here it is largely undisputed that the cash collateral used in July 2013, even if not authorized in advance, was used for operating expenses. Although Illinois State Bank questions whether Karen Garbacz's salary was appropriate or the rent her was reasonably equivalent of the value of the property rented by her, the bank has not shown that either the salary or rent were in fact unreasonable or unnecessary. Similarly, it has not been shown the unauthorized emergency purchase of the replacement Bobcat during the height of the winter plowing season was unreasonable or unnecessary for the company to continue to operate.

The Debtor should have sought authorization in July 2013 before using Illinois State Bank's cash collateral and again before purchasing the replacement Bobcat in February 2014. However, the error seems to have been unintentional, caused largely by admitted miscommunications between counsel and the Debtor's principals, blue collar workers possessing a high school education who were unfamiliar with the bankruptcy process. More importantly, it appears that the Debtor has learned its lesson and has shown for more than a year since then that it now can and will operate within its

budget and adhere to the terms of cash collateral orders.  Indeed, in the

compromise agreement and stipulation entered on December 5, 2014,

Waterworks agreed that should it again exceeds any budget line item by 105%

or more in the future without advance approval it shall be deemed to have

waived any defense to a motion to convert or dismiss the case. (ECF No. 334.)

There has been no allegation that the Debtor has so exceeded its subsequent

budgets.  Upon consideration of the totality of the circumstances, the Court

finds that the occasions when the Debtor used cash collateral without

authorization were isolated whose limited effect benefited creditors as well as

the Debtor, and do not constitute cause to convert the case at this time.

_Profitability._  The Debtor has shown marked improvement in its prospects

for sufficient profitability to support a confirmable plan of reorganization since

the first few months of this case.  During the first 3½ months of the case the

Debtor reported an average net monthly loss of $20,036.50.  In contrast, over

the next 20 months, through June 2015, the Debtor has shown average net

monthly profits of $5,166.70.  For purposes of assessing the Debtor's ability to

make payments through a plan of reorganization, it is also appropriate to

consider the "adequate protection" that the Debtor has been paying to the bank

its monthly income.  When the adequate protection payments are included,[8]

---

[8] In this analysis, the Court does not add payments on pre-petition auto loans or leases that have been paid as adequate protection payments to Ford Motor Credit Corporation (see Order Granting Motion for Adequate Protection, 7/31/13, ECF No. 35; See also ECF No. 36) and treated as expenses in the cash collateral budgets.  Such payments were in the amount pursuant to the terms of the underlying agreements, and the proposed plan provides for the Debtor to continue making such payments in the same amounts.  .

the Debtor's 20-month average monthly profit increases to $17,112.55.[9] The Debtor credibly attributes its improved profitability to changes to its business model that rely more on commercial customers rather than individual residential contracts.

The Debtor has proposed a plan that provides for payment in full of the claims of its secured and priority creditors with interest over a five-year period. Based on allowed claims, the plan will require average monthly payments of $10,096.94, an achievable amount from the perspective of the Debtor's post-petition average profits. Especially in light of the Debtor's performance over the last twenty months, it is reasonable to expect that the Debtor will be able to afford the payments proposed in its plan. Although the issue is one better suited to a plan confirmation hearing, based on the evidence presented in connection with this motion, Illinois State Bank failed to demonstrate that the Debtor does not have "a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A).

Indeed, based on payments that have been made to Illinois State Bank – by far the Debtor's largest creditor – the Debtor may be able to propose a feasible plan with even lower payments. As of mid-2015, the Debtor has made $238,917 in periodic adequate protection payments, plus $8,000 in vehicle sale proceeds payments and $114,950.87 in excess proceeds of the sale of the Garbaczes' second home to Illinois State Bank. According to the agreed interim

---

[9] Even when those first 3½ unprofitable months are included, Debtor's two-year post-petition average net profits is $10,921.04 per month when its adequate protection payments are taken into account.

cash collateral orders, most of these post-petition payments reduced principal. This means that Illinois State Bank already has received $361,867.90, over 50% of its petition date claim of $694,264.26, since this case commenced in 2013. Because the Debtor used the larger petition date claim balance in its calculation of plan payments for its initial plan, it is not unreasonable to expect that the necessary monthly plan payment may prove to be lower than what it now proposes. Again, however, this issue is best resolved at the confirmation hearing.

*Post-Trial Arguments*. Illinois State Bank raised several new arguments in its post-trial briefs based on certain testimony at trial. None of these arguments, however, demonstrate "cause" to convert the case at this time.

The bank points to testimony of Ms. Garbacz that the Monthly Operating Reports were regularly prepared by the Debtor's accountant, Kevin Miller, before she signed them. Ms. Garbacz admitted that she did not review them all, explaining that she did not look at the details because she would not understand them. From this testimony, Illinois State Bank argues that the filed Monthly Operating Reports "are a nullity, have no value and should be viewed as non-existent." (ECF No. 209, 29-30.) The bank does not furnish authority that supports its proposition that an officer's limited understanding of accounting statements and reliance on an accountant to prepare the operating reports renders them a "nullity." The testimony presented does not show that the signed monthly operating reports with no involvement in their

preparation, or signed them in blank only to be completed later by another. Instead, the testimony at trial shows that Karen Garbacz, a person with no business training, entered expenses and other financial information into the Debtor's Quickbooks files which the accountant Mr. Miller prepared the operating reports. She also reviewed and reconciled Quickbooks entries entered by the Debtor's office staff. Ms. Garbacz further credibly testified that she reviewed the monthly operating reports prepared by Mr. Miller, even if that review was not in detail.

Illinois State Bank also complains that the Debtor overpaid Ms. Garbacz for her work while paying Roger Garbacz little or no salary. The bank speculates that the Debtor did this to allow Mr. Garbacz to avoid paying his creditors. The bank, however, has not presented credible evidence that shows that the salary paid to the Debtor's president was unearned or unreasonable. Further, the Court notes that that Illinois State Bank is perhaps not the best party to raise such an argument, as it admits holding a $510,777.93 judgment jointly Ms. Garbacz and her spouse.

The bank also argued after the evidentiary hearings that that the Debtor might have incurred post-petition debt outside the ordinary course of business without court authorization by spending customer deposits before earned. (Post-Trial Brief, ECF No. 209, 25.) However, the bank neither raised nor offered evidence at trial that any customer deposit was used before earned, much less that it was outside the ordinary course of business. Indeed, Illinois

State Bank acknowledges that the Debtor did not "provide any witness who could identify what dollar amount the Debtor has taken from customers for work that is yet to be performed." (Id.)  Nor did the bank, despite the opportunity for discovery permitted it by the Court before the trial.

Finally, the bank in its post-trial brief identifies a $59,000 discrepancy in the Debtor's reported net income in 2012 between profits and losses presented by the Debtor in its Exhibit J and in the document which the bank presented as its Exhibit 32.  The Court did not give much weight to either exhibit.  As discussed above, given the change in the Debtor's business model, the Court finds the performance and profitability reports since 2012 to be more probative of the Debtor's future performance and ability to complete a confirmable plan that contradictory records from the months leading up to the commencement of this case or from the early, mistake-prone months immediately following.

Illinois State Bank seems to argue that the discrepancy demonstrates the incompetency of the Debtor or its officers or agents.  However, a single mistake in a single internal financial document does not constitute cause for the drastic remedy of converting the case to Chapter 7.

In support of its argument for conversion the bank cites to *In re ARS Analytical, LLC*, 433 B.R. 848 (Bankr. D.N.M. 2010), where the court found cause to convert for gross mismanagement in part where the debtor's Chief Operating Officer "did not have a good grasp of daily activities at the Debtor or the operation of the Debtor's bankruptcy estate[, delegated many duties that

were] not followed up on[, and] did not prepare [Monthly Operating Reports],
seemed unfamiliar with their requirements, and delegated the duty to fill them
out to someone in Louisiana." *Id.* at 864. Unlike the present case, the court
found substantial or continuing loss to or diminution of the estate because the
debtor in *ARS Analytical* "lost $319,500 in the first four months after
bankruptcy[, p]rojected future revenues were $-0- for some indefinite future
[and p]rojected expenses going forward would be $48,000 per month plus
attorney and reorganization fees." *Id.* at 862. In contrast, Waterworks, Inc. has
generated gross revenue during this case and, with the exception of its troubled
first few months, reports profits. Also in marked contrast to the notably absent
officers of ARS Analytical, Waterworks principals have been shown to be deeply
engaged in the day-to-day operations of Waterworks and are actively
participating in the bankruptcy proceedings. *See, e.g., id.* at 864 (where the
debtors president had resigned, its CEO may never "even [have come] to New
Mexico" and the COO "appeared at the office maybe one day per month". The
court in *ARS Analytical* found many examples of mismanagement and while
"[e]ach individual one may not be significant ... when taken together, they
amount to a gross mismanagement." *Id.* The many examples included, the
chief operating officer's lack of knowledge "of daily activities at the Debtor or
the operation of the Debtor's bankruptcy estate," evidence that no one was
attempting to collect the debtor's account receivables, failure to invoice
customers for work performed, the failure to pay post-petition rent, and

unability to determine its own financial condition. *Id.* at 864-65.  In contrast, Evidence of such gross mismanagement have not been presented here.

B. Appointment of a Chapter 11 Trustee

Illinois State Bank alternatively moves for the appointment of a Chapter 11 trustee.  On request of a party in interest,

the court shall order the appointment of a trustee—

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).  The movant must demonstrate cause by clear and convincing evidence. *See In re Chardon*, No. 13-B-81372 (Bankr. N.D. Ill. July 1, 2015); *In re LHC, LLC*, 497 B.R. 281, 291 (Bankr. N.D. Ill. 2013).

Appointment of a Chapter 11 Trustee is an extraordinary remedy. *Kwitchurbeliakin, LLC v. Laporte Sav. Bank*, 2011 WL 93714 (N.D. Ind. Jan. 10, 2011) (citing *Adams v. Marwil*, 564 F.3d 541, 546 (2d Cir. 2009)); *In re LHC, LLC*, 497 B.R. at 291.  The appointed trustee not only supervises a case, but takes over, displaces and divests the current management of all control of and possession of property of the debtors' estate. *In re Footstar, Inc.*, 323 B.R. 566, 572 (Bankr. S.D.N.Y. 2005).  Indeed, the section contemplates that "when a

trustee is appointed, he assumes control of the business, and the debtor's directors are 'completely ousted.'" *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 352-53 (1985). See also *Abdulla v. Klosinski*, 523 Fed. Appx. 580 (11th Cir. July 10, 2013) (appointment of Chapter 11 "trustee would have ousted [principal] from control of [debtor's] operation and could have resulted in the liquidation of its assets."). A court "cannot ignore the competing benefit *and* harm that such an appointment may place upon the estate." In re *General Oil Distributors, Inc.*, 42 B.R. 402, 409-410 (Bankr. E.D.N.Y. 1984) (noting the substantial financial burden the administrative cost of a trustee may impose on the already beleaguered estate). Accordingly, the appointment of a trustee "is a fact-sensitive determination that must be made on a case-by-case basis." *In re LHC, LLC*, 497 B.R. at 291. See also *In re G-I Holdings*, 385 F.3d at 318 (the determination of "whether the moving party has satisfied its burden under either subsection [of Section 1104(a)] is committed to the court's discretion").

In order to appoint a trustee the "court must find something more aggravated than simple mismanagement." *In re LHC LLC*, 497 at 309. Illinois State Bank, however, alleges the same "cause" for appointment of a trustee as it asserts for conversion of the case. For the same reasons, it fails to demonstrate such cause as to warrant the requested appointment.

Nor has it been shown that appointment of a trustee is in the best interests of creditors, equity security holders and other interested parties.

While the Debtor and the Garbaczes have made a number of mistakes in the
course of this bankruptcy case, the record presented shows that by dint of the
their substantial individual efforts – frequently made at not insignificant
personal cost – the Debtor has been able to operate its post-petition business
so as to honor its existing customer contracts and maintain a viable customer
base all the while liquidating unneeded assets for its creditors.  Karen and
Roger Garbacz are not sophisticated businesspeople.  But it has not been
shown that they do not know their business.  Rather, the record presented
indicates that they are capable of and engaged in developing Debtor's revenue
streams for the benefit of their company and its creditors.

It is apparent that the Garbaczes have learned hard lessons from earlier
mistakes.  Moreover, they and the Debtor remain under the unblinking gaze of
its creditors, and in particular the close scrutiny of Illinois State Bank.  The
record suggests, if anything, that Ms. and Mr. Garbacz may well play a critical
role in the operations of their company and that they are capable of and
committed to leading their business through reorganization.  Further, it now
appears the appointment of a trustee, saddling the estate with the expense of a
appointed trustee and additional counsel, and the removal of the Garbaczes
from management may well seriously handicap the Debtor's efforts to maintain
its customer base and operating income.  Thus, the Court must conclude for
now that the interests of the creditors, equity security holders and interested
parties is better served by permitting the Garbaczes to continue to lead the

Debtor while it attempts obtain confirmation of a plan of reorganization by which it can repay its indebtedness with revenues from the operating business.

## Conclusion

These are the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(2) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(2) (made applicable by Fed. R. Bankr. P. 7052).  For the reasons set forth above, the motion of Illinois State Bank to convert the case to Chapter 7 or in the alternative to appoint a Chapter 11 trustee will be DENIED.

DATE: September 23, 2015

ENTER:

Thomas M. Lynch
United States Bankruptcy Judge